John J. KEFALAS, Plaintiff,

v.

BONNIE BRAE FARMS, INC., et al., Defendants.

and

Kevin GREVEY, Plaintiff,

v.

BONNIE BRAE FARMS, INC., et al., Defendants.

Civ. A. Nos. 83–390, 83–391.

United States District Court,
E.D. Kentucky,
Lexington Division.

June 4, 1985.

Bernard J. DiMuro, Hirschokop & Grad, Alexandria, Va., J. Robert Stansbury, Lewis, Scoville, Scoville & Stansbury, London, Ky., for plaintiffs.

Harry B. Miller, Jr., Miller, Griffin & Marks, PSC, George Gregory, McBrayer, McGinnis & Leslie, Lexington, Ky., Luis Guinot, Jr., Chapman, Duff & Paul, Washington, D.C., James E. Toombs, Lexington, Ky., Dennis Dean Kirk, Washington, D.C., William T. Bishop, III, Laurance B. VanMeter, Stoll, Keenon & Park, Lexington, Ky., for defendants.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

The plaintiffs in this action allege, inter alia, violations of federal and state securities laws in the sale of fractional interests in a thoroughbred breeding syndication. The defendants have moved for summary judgment on the securities claims as well as on a RICO claim.

The Syndicate Agreements that form the basis of this action divide ownership of three thoroughbred stallions into fractional interests for breeding purposes. Each stallion is divided into forty undivided interests. For each fractional interest owned, the purchaser is given the right to breed a mare to the stallion (a "nomination"). The owner of the mare is given sole ownership of any foal. Expenses of maintaining the stallion are shared pro-rata by the purchasers of the fractional interests.

The owner of a fractional interest has a very large measure of control over his breeding rights. While the actual breeding schedule is arranged by the syndicate manager, the owner of a fractional interest may either use the nomination, deciding himself which of his mares to breed to the stallion, or sell the nomination for his own account subject to the other owners' right of first refusal.

The plaintiffs allege that the defendants were engaged in a fraudulent scheme to sell the fractional shares by representing that the defendants would sell the plaintiffs' nominations to other breeders. This was to result in a net profit for the investor with no risk of loss.

Based on these representations, the plaintiffs purchased fractional shares of three stallions. They owned no mare of their own, and expected the defendants to sell their nominations. This did not occur. The plaintiffs allege that the representations converted the fractional shares into securities regulated by various state and federal statutes; that the defendants breached the duties of disclosure imposed by those statutes; and that the defendants fraudulently induced the sale of the fractional shares.

## FEDERAL SECURITIES CLAIMS

The first step in determining whether there has been a violation of the federal securities laws in this action is to determine whether or not a breeding syndication agreement falls within the definition of "security" as found in Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). Although variations in the terms of syndication agreements may sometimes compel a different result, the Court finds that the

agreements found in this case are not securities.

Because the 1933 and 1934 Acts do not specifically list a syndication agreement as a security, it is necessary to determine whether an interest in a breeding syndicate is an "investment contract." The United States Supreme Court set forth standards for making this determination in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The touchstone is (1) the presence of an investment (2) in a common venture (3) premised on a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060.

The arrangement in this case was not a common venture. The test in this regard is one of horizontal commonality—whether the fortunes of the individual investor were tied to the success of the venture as a whole. *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir.1981).

In this case, each purchase of a fractional interest "is unitary in nature and each will be a success or failure without regard to the others." *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 277 (7th Cir.1972), *cert. denied* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). The Syndicate Agreement clearly states that the "principal purpose" of the syndicate "is to assure [the purchaser] the right to breed mares owned by him to the Stallion." *See e.g.* Lydian Syndicate Agreement, ¶ 8.1.

Although the plaintiffs correctly note the possibility of increase in the value of their nominations due to the stallions developing reputation, their greatest expectation of profit comes from another direction. While the nomination itself is of some value, the owners derive profits from the value of the offspring—a value dependent in large part on the quality of the mare, the work of the trainer, and the fortunes of the foal's racing season. The profits of the owners thus depend on their own efforts and good for-

tune in addition to the efforts of the syndicate manager. A rising tide, in this case an increase in the value of the nomination, will not lift all boats to the same height.

Even assuming that an expectation of profits is reasonable, *Forman* directs the Court to determine whether these profits will be "derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852, 95 S.Ct. at 2060. As was shown above, the profits derived from this arrangement depend on the skills and fortunes of the individual owner rather than on those of the syndicate manager.

Although the plaintiffs and the defendants rely on many of the same authorities regarding the definition of a security, the plaintiffs' argument is dependent on their claim that their profits were to be derived when the syndicate manager sold their nominations to other breeders. Plaintiffs compare themselves to the unfortunate purchasers of chinchillas in *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir.1974), who were to make untold fortunes by breeding chinchillas and selling the offspring back to the Group for sale to other investors. The plaintiffs fail to note, however, that the contract in *Miller* specifically *required* the Group to purchase all descendants of the chinchillas originally sold to the investors. In the case a bar, the Syndicate Agreements clearly and specifically state that the syndicate manager would do no more than furnish a list of breeders who had inquired as to the availability of nominations. *See e.g.* Lydian Syndicate Agreement, ¶ 8.2(f). Selling these nominations would be the job of the owner, and any profits derived would necessarily depend on the skills and efforts of the owner rather than those of the syndicate manager.

The Syndicate Agreement itself, when read as a whole, reflects the fact that the agreement is designed to allow the purchaser to *use* or *consume* the item purchased. In such a situation, "the securities laws do not apply." *Forman*, 421 U.S. at 853, 95 S.Ct. at 2061.

## STATE SECURITIES CLAIMS

■ The plaintiffs also allege violations of state securities laws. Although the complaint is framed in terms of Virginia statutes, the Agreements provide that Kentucky law shall apply. *See e.g.* Lydian Syndicate Agreement, ¶ 14.2.

In *Scholarship Counselors, Inc. v. Waddle*, 507 S.W.2d 138 (Ky.1974), the Kentucky Court of Appeals, then the Commonwealth's highest court, noted that the definition of a security found in the federal Securities Acts is "substantially the same" as that found in the Kentucky securities law, KRS 292.310(11). That court also adopted the method of analysis used in *Howey* for determining when an instrument is a security. *Id.* The securities claims made under the Kentucky statute must, therefore, fail for the same reasons as the claims made under the federal Securities Acts.

## RICO CLAIMS

■ The plaintiffs further allege that the defendants' actions constitute "racketeering activity" as defined by the Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO). To state a claim for damages under the RICO statute, the plaintiffs must first show that the defendants were engaged in a pattern of racketeering activities, that the activities of the defendants constituted an "enterprise", as that term is defined by § 1961(4), and that the plaintiffs were injured as a result of the defendants' violation of the RICO statute. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983).

The term "racketeering activities" is also specifically defined by the statute. 18 U.S.C. § 1961(1). In this case, the plaintiffs rely on the portion of the definition which defines as racketeering activity "any offense connected with ... fraud in the sale of securities." Since, however, this Court has found that the agreements forming the basis of this action do not fall within the definition of "securities", there can have been no offense that would fall within the definition of "racketeering activ-

ities." Because this essential element of the RICO cause of action cannot be shown, there can be no viable RICO claim.

Accordingly,

IT IS ORDERED:

(1) that the motion of defendants Ron Rosen and Bonnie Brae Farms, Inc. d/b/a The Alchemy for partial summary judgment is GRANTED.

(2) That Counts I, II, III, IV and V of the plaintiffs' complaints are DISMISSED as to these defendants.