111 F.3d 138
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Ernest GAILLARD, Plaintiff-Counter-Defendant-Appellant,
v.
Arthur B. HANCOCK, Defendant-Counter-Claimant-Appellee.
 No. 95-56252.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 10, 1997.
Decided April 14, 1997.
 
 1
 Before: FLETCHER and TROTT, Circuit Judges, and JENKINS, District Judge*.
 
 
 2
 MEMORANDUM**
 
 
 3
 Ernest Gaillard and Arthur Hancock, III each owned interests in a thoroughbred racing horse, Sunday Silence. Gaillard contends that a contractual agreement among the co-owners prohibited Hancock from selling his interest in four breeding rights in Sunday Silence without Gaillard's consent and without sharing pro rata in the proceeds. Therefore, he argues that he was entitled to a pro rata share of the payment Hancock received for these four breeding rights. Gaillard further contends that Hancock could not sell his interest in the four breeding rights because 1) they were contingent on a condition precedent which could never occur after the horse was sold and 2) they were conditioned on Hancock's performance of personal services and therefore could not be assigned. Thus, according to Gaillard, because the breeding rights had no value, the payment to Hancock for these rights was in fact an additional payment for his ownership interest in the horse and, as such, must be shared pro rata with the other co-owners.
 
 
 4
 The district court granted summary judgment to Hancock. We have jurisdiction, 28 U.S.C. § 1291, and we affirm. Hancock had something to sell, and he sold it.
 
 I.
 
 5
 Sunday Silence was co-owned by four individuals: Hancock owned 15 shares; Zenya Yoshida, a Japanese investor, owned 10 shares; Gaillard owned 8 shares; and, Charles Whittingham, the horse's trainer, owned 7 shares. On March 29, 1990, these four co-owners entered into two written agreements regarding Sunday Silence. The "Breeding Rights Agreement" provided that:
 
 
 6
 Upon completion of Sunday Silence's racing career, or at such earlier time as agreed upon pursuant to this Agreement, a racing and/or breeding syndicate will be formed with Arthur Hancock or Stone Farm named as the syndicate manager. The parties shall enter into a syndicate agreement with such terms and conditions as are customary in the thoroughbred industry.
 
 
 7
 The Breeding Rights Agreement further provided for the parties to share "all racing expenses and proceeds relating to Sunday Silence" based on their respective interests. Whittingham would be the trainer and make all decisions regarding racing. Upon completion of Sunday Silence's racing career, a breeding syndicate would be formed with Hancock or Stone Farm (Hancock's breeding farm) as the syndicate manager and Sunday Silence would be boarded at Stone Farm. The Breeding Rights Agreement also provided that, upon syndication of Sunday Silence, each holder of a share would be entitled to one "nomination" (breeding right). In addition to any breeding rights he may be entitled to because of his ownership of shares, Yoshida would be entitled to one breeding right, Hancock would be entitled to four breeding rights, as was customary for the syndicate manager, and Whittingham would be entitled to one breeding right, as was customary for the trainer.
 
 
 8
 On the same day the four co-owners entered into the Breeding Rights Agreement, they entered into another contract entitled the "Sale of Interests Agreement." The Sale of Interests Agreement provided:
 
 
 9
 that, prior to the syndication of Sunday Silence, if any one of the parties [to the Agreement] receives an offer from a third party to purchase all or part of his interest, he will give each of the other parties to this Agreement an option to participate on a pro rata basis in the sale, so long as such other party is willing to sell its pro rata interest on the same terms and conditions as set forth in the offer.
 
 
 10
 After Sunday Silence retired from racing in July 1990, he was sent to Stone Farm to stand at stud. The four co-owners negotiated a syndication agreement dated September 1990. However, before this agreement was executed,[1] Yoshida bought out the other co-owners' shares in Sunday Silence. Because Yoshida purchased Sunday Silence outright before the syndication agreement was executed, the syndicate was never formed. Thus, neither Hancock nor Stone Farm was ever named as the syndicate manager, and Hancock never performed the duties of syndicate manager.
 
 
 11
 Yoshida paid the co-owners $250,000 per share for their 30 shares. After Gaillard orally agreed to sell his interest, but before the sale was final, Gaillard discovered that, in addition to $250,000 per share, Yoshida agreed to pay Hancock $750,000 for the four extra breeding rights Hancock was to have acquired as syndicate manager. Hancock executed two documents entitled "Bill of Sale" transferring his interests in Sunday Silence to Yoshida. By one Bill of Sale he transferred to Yoshida his 3/8 ownership interest in Sunday Silence and by the other he transferred his four additional breeding rights as provided in the Breeding Rights Agreement.
 
 
 12
 After Yoshida purchased the horse, Gaillard brought an action in California state court against Hancock for breach of implied contract,[2] breach of the Breeding Rights Agreement, breach of the Sale of Interests Agreement, fraud and deceit, breach of fiduciary duty, and accounting of sale. Hancock removed the case to federal district court based on diversity of citizenship and moved for summary judgment. The district court granted Hancock's motion for summary judgment, ruling that, even if the four breeding rights were contingent upon syndication, California law provides that a party may sell a right that is contingent upon a future event. Thus, because the breeding rights were separate from Hancock's ownership interest in Sunday Silence, he had the right to sell them. Gaillard timely appealed.
 
 II.
 
 13
 A grant of summary judgment is reviewed de novo. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). The appellate court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). Suitum v. Tahoe Regional Planning Agency, 80 F.3d 359, 361 (9th Cir.1996). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Bagdadi, 84 F.3d at 1197.
 
 A.
 
 14
 Gaillard argues that the district court erred in ruling that Hancock could sell his breeding rights without the consent of the co-owners. The district court found that the breeding rights Hancock was afforded as the future syndicate manager under the Breeding Rights Agreement were separate from, and independent of, Hancock's ownership interest in Sunday Silence. Hancock would have benefited significantly from these additional breeding rights, as well as from performing the role of syndicate manager. Yoshida clearly recognized this value when he offered an additional sum to Hancock, beyond the payment for his ownership interest, in exchange for his relinquishing these rights and executed two separate bills of sale.
 
 
 15
 Gaillard points to no language in either contract between the co-owners which prevents Hancock from selling his four breeding rights without the consent of the other co-owners or from keeping the proceeds from such a sale. Although the Breeding Rights Agreement states that the co-owners "shall share, based on their respective interests, all racing expenses and proceeds relating to Sunday Silence," the parties could not have contemplated income from the sale of an ownership interest in Sunday Silence as included in "proceeds relating to Sunday Silence." This construction of the Breeding Rights Agreement would require the absurd result that Gaillard, Hancock and Whittingham would all be required to share, pro rata, the "proceeds" from the sale of Sunday Silence to Yoshida with Yoshida himself because he too was a party to the agreement. This is not how the sale was transacted and certainly cannot be a correct interpretation of the terms of the Breeding Rights Agreement. Thus, income from the sale of an ownership interest need not be divided pro rata among the co-owners.
 
 
 16
 Proceeds from the use or sale of additional breeding rights could also not have been intended to be included in "proceeds relating to Sunday Silence." Including breeding rights would render the fact that the parties were entitled to additional breeding rights based on their different responsibilities after syndication meaningless. If the parties were required to share, pro rata, all proceeds from the breeding rights granted under the agreement then the benefit of the breeding rights would, in actuality, be divided based on ownership interests not based on the provisions of the agreement.
 
 B.
 
 17
 Gaillard argues that, pursuant to the Breeding Rights Agreement, Hancock's four additional breeding rights were contingent upon the syndication of Sunday Silence. He argues that, because Yoshida purchased the horse prior to syndication, Hancock's four breeding rights never vested and thus had no value. Implicit in Gaillard's argument is the assumption that if the four breeding rights had no value, payment for those rights was in fact additional consideration for Hancock's ownership interest and, as such, were "proceeds relating to Sunday Silence" to be divided pro rata among the co-owners. For the reasons stated in section II.A., supra, even if Gaillard is correct and the four breeding rights had no value, any additional payment made to Hancock for his ownership interest cannot be "proceeds relating to Sunday Silence" as contemplated by the Breeding Rights Agreement. Thus, Hancock had no contractual obligation to share this payment with Gaillard pro rata.
 
 
 18
 Even if Hancock would be obligated to share a payment if it was compensation for his ownership interest, this argument fails. Yoshida offered to purchase Hancock's contingent breeding rights when it was still possible for the contingency--syndication of Sunday Silence and Hancock's serving as syndicate manager--to occur. Although Hancock's right to the four additional breeding rights was extinguished when Yoshida purchased Sunday Silence, the rights did have value prior to the sale and at the time the deal was negotiated. The Breeding Rights Agreement stated that Sunday Silence would be syndicated, Hancock or Stone Farm would serve as syndicate manager, and Hancock or Stone Farm would receive four additional breeding rights. Thus, although the rights were contingent upon syndication, Hancock was compensated for relinquishing these contingent rights. Because California allows a party to sell a right that is contingent upon a future event, Dougherty v. California Kettlemen Oil Royalties, Inc., 9 Cal.2d 58, 59 (1937), the rights were assignable, and of value, at the time they were purchased by Yoshida. The payment for breeding rights was not an additional payment for Hancock's ownership interest in Sunday Silence.
 
 C.
 
 19
 Gaillard argues that the language in the Breeding Rights Agreement providing for Hancock to manage the syndicate was a personal services contract. As such, he argues, contract law prohibits the assignment of the duties of syndicate manager. He then concludes that, because the assignment of the burden of personal services under the contract is prohibited, the assignment of the benefit of that contract is prohibited as well.
 
 
 20
 We need not reach this issue because it was not raised before the district court. Brogan v. San Mateo County, 901 F.2d 762, 765 (9th Cir.1990) ("Issues raised for the first time on appeal generally will not be considered unless the questions are purely legal ones, the record is fully developed, the resolution of the issue is clear and injustice might otherwise result."). However, this argument wholly lacks merit. Hancock did not assign his obligation to manage Sunday Silence, he simply assigned the benefit of that obligation--the four breeding rights. Although the assignability of the burden of performing personal services under contract may be limited, Fenn v. Pickwick Corp., 4 P.2d 215, 217 (Cal.Ct.App.1931), the benefit of performing such obligations clearly may be assigned. Indeed, the assignment of benefits of performing personal services contracts is a quite common form of commercial agreement.
 
 III.
 
 21
 Hancock requests attorney's fees and costs on appeal pursuant to the Breeding Rights Agreement which provided for attorney's fees and costs to be awarded to the prevailing party in any dispute arising regarding the terms of the agreement. Because Hancock is the prevailing party on appeal, we grant his request. N.L.R.B. v. Swedish Hospital Medical Center, 619 F.2d 33 (9th Cir.1980) (the court can award fees and costs to the prevailing party on appeal pursuant to the contractual agreement between the parties). We refer the question of the amount of fees to this court's Appellate Commissioner for initial consideration and recommendation.
 
 CONCLUSION
 
 22
 The district court correctly concluded that Hancock violated no provision of the agreements entered into by the parties. No genuine issues of material fact remained for trial.
 
 
 23
 AFFIRMED.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The agreement was signed only by Whittingham and Gaillard before Yoshida offered to buy out the other co-owners
 
 
 [2]
 Although Hancock originally styled this cause of action "breach of implied contract" the district court interpreted this claim as one for breach of the covenant of good faith and fair dealing which is implied in California contracts