John A. DIMARIO, Plaintiff,

v.

Albert P. COPPOLA, Sr. and Drumlanrig Farm, Defendants.

No. 95 CV 237 JBW.

United States District Court,
E.D. New York.

May 4, 1998.

Abberley Kooiman, New York City by Richard Langsam, for plaintiff.

Amon & Sabatini, New York City by Thomas G. Amon, Wickwire Gavin, P.C., Vienna, VA by L. James D'Agostino, Christopher L. Rogan, for defendants.

*AMENDED MEMORANDUM, ORDER, AND JUDGMENT*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. Introduction ............................................................215
II. Facts and Contentions............................................215
 A Oral Agreement.................................................215
 B Horse Racing Industry.........................................216
 C Runaway Groom ...............................................217
III. Procedural History ...............................................219
IV. Law ..................................................................219
 A Standard for Summary Judgment ..........................219
 B Existence of Binding Agreement .............................219
 i Express Reservation .........................................220
 ii Partial Performance ........................................220
 iii Material Terms to Be Negotiated .........................220
 iv Type of Agreement Usually Reduced to a Writing ......221
 v Consideration................................................221
V. Application of Law On Existence of Contract to Facts .......221
VI. Statute of Frauds..................................................223
VII. Statute of Limitations ............................................223
VIII. Construction of Terms of Oral Agreement ..................224
IX. Unjust Enrichment ...............................................226
X. Conclusion .........................................................226

## I. Introduction

This case involves the construction of unique oral employment agreements within the Thoroughbred horse racing industry. Plaintiff, the former trainer of Runaway Groom, a successful Thoroughbred race horse, claims breach of a June 1982 oral employment contract with defendants Albert P. Coppola, Sr. and Drumlanring Farm. All parties agree that if there was a contract it incorporated the standards and customs of the horse racing industry. At issue is enforceability and construction of the agreement. Applying industry standards as well as New York's contract principles, summary judgment for the defendants is required.

## II. Facts and Contentions

### A. Oral Agreement

In June of 1982, the plaintiff and defendants entered into an oral employment contract: the plaintiff would train and race the defendants' Thoroughbred stallion race horse, Runaway Groom. The horse was then moved from Canada to Belmont Park in New York. Plaintiff trained the horse from June, 1982 to October, 1982.

Oral employment agreements between race horse owners and trainers are standard in the horse racing industry. Tr. at 3; Tr. at 38. These agreements provide for trainer compensation equal to the cost of the daily upkeep of the horse plus 10% of the horse's winnings. Def. Res. to Pl. Opp. Sum. J. at 3; J. DiMario Dep., Vol. 2, at 35–37.

216 .

Plaintiff alleges that successful trainers are traditionally entitled to additional compensation. This remuneration, plaintiff contends, was declared by the defendants on numerous occasions between 1982 and 1993 to be 10% of the earnings derived from the syndication of the horse, namely 10% of the gross proceeds realized from the sale of forty equal shares of the horse. It is plaintiff's view that this additional payment is required by industry custom. Defendants maintain that customary additional compensation is limited to one breeding right of the trainer per year in the stallion, as opposed to a percentage of the syndication.

Plaintiff asserts that defendants orally confirmed that the additional compensation would be 10% of the syndication of the horse after it won "The Prince of Wales" race on August 8, 1982, and again on August 21, 1982 after it won "The Travers Stakes." Dep. J. DiMario, Vol. I, at 42–48, 134–140, 158, and Vol. II, at 34–41, 43–45, 77. By 1993, ten years after syndication began, only twenty nine shares of the forty provided in the syndication agreement had been sold. Coppola Dep. at 59.

Defendants maintain that plaintiff was given notice that he would not receive 10% of the gross profits derived from syndication of the horse when the syndication agreement was executed in March of 1983, thus causing the six year statute of limitation to begin running on the sale of the first share of the syndication agreement, so that the statutory period expired in 1989. Plaintiff counters, that while syndication of the horse was started, it was never completed so the statute of limitations did not begin to run until the defendants repudiated the contract sometime in 1993.

During the course of plaintiff's employment he received a per diem rate of $108 per day and 10% of the horse's gross winnings. In 1983, when the horse was syndicated, plaintiff also received one breeding right per year in the stallion. Plaintiff has exercised this right every year since 1984. J. DiMario Dep., Vol. 1, at 92; Tr. at 14. Defendants claim that this lifetime breeding right is payment in full for any additional compensation.

B. Horse Racing Industry

The horse racing industry has a long and rich tradition from which modern trade usage and custom is derived. Contests of speed between horses are among the oldest diversions of humanity. See 11 Encyclopedia Britannica 714 (1967). Horse racing owes much of its development to the Greeks, who by 1200 b.c. had developed and refined the sport of chariot contests. See Melvin Bradley, Horses: A Practical and Scientific Approach 36 (1981). Racing without chariots is said to have later developed independently, though it was "an important part of the first Olympic games" of 776 b.c. Id. As early as 1500 b.c. "Kikkuli of the land of Matinni" composed a lengthy treatise on the breeding and training of horses. 11 Encyclopedia Britannica 714 (1967).

Modern day racing, "the sport of kings," owes its origin to the nobility of England who developed racing as a popular amusement. Id. at 714–15. It is the traditions of Western Europe's aristocracy that have defined modern equine standards and practices, including the industry's reliance on oral "gentlemen's" agreements. But cf. John J. Kropp, et al., Horse Sense and the UCC: The Purchase of Racehorses, 1 Marq. Sports L.J. 171, 173 (1991) ("The days of handshake deals in the horse business are rapidly coming to an end.").

The popularity of the sport with the general public is credited to Henry II who in 1174 promoted the Smithfield races, where the aristocracy came to purchase race horses, and the multitudes came to watch. See 11 Encyclopedia Britannica 714 (1967); see also Bradley, supra, at 36. It was Charles II who is credited with establishing the modern day Thoroughbred bloodline, earning him the title "father of the British turf." 11 Encyclopedia Britannica 714. Modern day race horses trace their origin to three sires: Godolphin Barb, Byerly Turk, and Darley Arabian. See Bradley, supra, at 40. Records of the progeny of these stallions has been meticulously kept for centuries. See id. In 1791 the General Stud Book was established to record Thoroughbred blood lines; and at this time the Thoroughbred breeding popula-

tion was closed. *See* 11 Encyclopedia Britannica 715.

The *American Stud Book* was established in 1873. It traces the history and origin of Thoroughbreds in America. *See* Bradley, *supra*, at 40, 42–43. Both the *General Stud Book* and *American Stud Book*, referred to as horse registries, are maintained and controlled by breed associations. 11 Encyclopedia Brittanica 715–16, 719. These organizations ensure that no horses bred through artificial insemination or embryo transfer are registered. *See* Stephen Budiansky, *The Nature of Horses* 238 (1994). Unlike the dairy-cattle business, the horse industry restricts breeding methods to maintain tradition and control. *See id.* at 236–39 This adherence to strict regulation has engendered specialized terminology and customs.

After successful male Thoroughbred race horses have finished their careers, they are often retired to a breeding farm. This is referred to as being retired "to stud." Ex. 3; Leonard Green and Jonathan Green, *Investing in Stallion Syndication*, Thoroughbred Times, Jan. 25, 1997, at 74. The owner of the stallion either retains the breeding rights or "syndicates" the animal. *See id.* In syndication the ownership interest in the thoroughbred is divided into shares, designed to provide access to breeders "when sole ownership is cost-prohibitive." Timothy Nicholas Sweeney, *Keflas v. Bonnie Brae Farms: A Practical Approach To Thoroughbred Breeding Syndications and Securities Law*, 75 Ky.L.J. 419, 422 (1987).

The standard syndicate agreement has "evolved into 40 shares for public sale, with three to six shares for the stallion manager or farm, and additional lifetime breeding rights to the horse's trainer, jockey, or both." Ex. 3; Green, *supra*, at 74. Each of the forty interests is equal and cannot be further sub-divided, but a full interest may be transferred. *See* Ex. 10; *see also* Thomas A. Davis, et al., *Horse Owners and Breeders Tax Manual* § 2.06(a), at 2–69 (1987 ed.).

Each syndicate interest grants the holder a proportionate share in the profits and expenses of the stallion, and one breeding right per year, called a "season." Jocelyn De Mourbray, *The Thoroughbred Business* xiii (1987); *see also Kefalas v. Bonnie Brae Farms, Inc.*, 630 F.Supp. 6, 6 (E.D.Ky.1985); Thomas Kiernan, *The Secretariat Factor* vii–x (1979). A season, also referred to as a "cover" or "nomination," "is the right to have a mare serviced by a named stallion during a particular [annual] breeding season." Jocelyn De Mourbray, *The Thoroughbred Business* xiii. These definitions are derived from traditional horse breeding terminology. Just as a mare who is at the point in her estrous cycle when she is ready to breed is said to be "in season," the stallion who copulates with the mare "covers" her back. *Id.* at 9.

There are profits only if the stallion is able to breed with more than the allotment of mares that constitute the entire syndicate, or "book." Tr. at 14. The additional seasons, or covers, are sold in a market commonly referred to as the bloodstock market. Tr. at 15. The stallion's seasons are sold to outside parties in two ways. First, on a guaranteed live foal basis if the offspring stands and nurses. Tr. at 28. Second, on a non-guaranteed basis, for the right to breed the horse with no guarantee of a live foal. Tr. at 27–28.

Expert testimony identified the lifetime breeding right as entitling the holder to breed one mare to the stallion each year. Tr. at 14. The holder does not share any of the profits of the stallion or pay any of the management fees. Tr. at 14.

C. Runaway Groom

RUNAWAY GROOM

Runaway Groom was highly successful. The horse competed in, and won, various stake races including "The Travers Stakes" in Saratoga, "The Rafty" at Belmont Park, and "The Prince of Wales" in Canada. "Stakes races are the highest class of race in any jurisdiction, and usually involve the largest purses." Kropp, *supra*, at 171 n. 1. For example, in 1983, the year that Runaway Groom was retired to stud, stakes races comprised only 3.5% of the races in North America, but " 'the purses they carried represented 21% of all the money earned by horses running that year.' " *See id.* (quoting J. Lohman & A. Kirkpatrick, *Successful Thor-* *oughbred Investment in a Changing Market* 43 (1984)). The horse was also named "Canadian Three Year Old Champion Colt" in 1982. These victories translated into enhanced value during the initial syndication offerings, since the cost of shares are determined by the racing success of the horse. Dep. J. DiMario, Vol. 1, at 58–60; Ex. 3; *see also* Thomas Kiernan, *The Secretariat Factor* viii–ix (1979).

In March of 1983, Runaway Groom was syndicated. The syndication agreement follows the custom of the industry, providing forty equal fractional interests in the stallion. Syndicate Agreement § 1.1. Each fractional

interest grants the holder one fortieth interest in the proceeds of the horse, one yearly breeding right, and an obligation to pay one fortieth of the horse's yearly upkeep. Syndicate Agreement §§ 1.1, 3.6, 4.2(c). It also provides for six annual breeding rights, four of which were conferred to the syndicate manager, Drumlanring Farm, one to the plaintiff, and one to a trainer to be later named. Syndicate Agreement § 4.2(a). No additional compensation to the plaintiff is referred to in the syndication agreement.

The plaintiff has exercised his lifetime breeding right every year since the syndication agreement was executed. He has neither been charged with the cost of keeping the horse, nor has he shared in any profit.

## III. Procedural History

In January 1995, asserting diversity jurisdiction, plaintiff sued in the District Court for the Eastern District of New York. He alleged (i) breach of oral contract; (ii) fraud and deceit subsequent to breach; and (iii) unjust enrichment. Defendants moved to dismiss all three causes of action for failing to state a claim. Only the plaintiff's second cause of action, for fraud and deceit subsequent to the breach of the alleged oral contract, was dismissed.

Subsequently, defendants moved for summary judgment on the remaining two counts, those for breach of oral contract and for unjust enrichment. Judgment was reserved pending presentation by the parties of expert witness testimony on custom. Expert witnesses have now testified before the court without a jury. Based on this testimony as well as depositions, affidavits and documents, defendants' motion for summary judgment on the remaining two counts is granted.

## IV. Law

### A. Standard For Summary Judgment

Summary judgment is appropriate "if the pleadings [and] depositions . . . together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "If a reasonable jury might evaluate the evidence to find the material propositions of fact a plaintiff must prove, summary judgment dis-

missing her suit must be denied." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir.1998). The "trial court's task at the summary judgment motion stage of the litigation is . . . limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Svcs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994).

It is appropriate for the district court to hold an evidentiary hearing to determine whether there are any genuine issues of fact. *Cf. Borawick v. Shay*, 68 F.3d 597, 609 (2d Cir.1995) (use of pre-trial evidentiary hearing to determine admissibility of testimony is a preferred procedure).

### B. Existence of a Binding Agreement

The first question is whether there was a binding oral employment agreement. Defendants contend that the lack of a meeting of the minds on a material term, namely the compensation component, indicates that there was no binding contract.

There is no need to determine which law applies under choice of law rules since the parties agree that New York law is the same as that in any jurisdiction whose law might arguably control. Since this is a diversity case, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), New York contract law controls.

■ Even in the absence of a material term there may still be a binding contract. New York law relies on settled common law contract principles to determine when parties in litigation intended to form a binding agreement. *See, e.g., Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 390 N.E.2d 1143 (1979); *see also Ciaramella v. Reader's Digest Assoc., Inc.*, 131 F.3d 320, 322 (2d Cir.1997) (no material difference between New York and common law standards); *Winston v. Mediafare Enter. Corp.*, 777 F.2d 78, 80–81 (2d Cir.1985) (applying principles drawn from Restatement (Second) of Contracts to determine whether a binding agreement existed under New York law).

> Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. . . . In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution. . . . In any given case

it is the intent of the parties that will determine the time of contract formation. *Winston v. Mediafare Entertainment Corp,* 777 F.2d 78, 80 (2d Cir.1985).

█ The intentions of the parties should, if possible, be determined from the totality of the circumstances. *See Woodcrest Fabrics, Inc. v. B & R Textile Corp.,* 95 A.D.2d 656, 658, 464 N.Y.S.2d 359, 361 (1st Dep't 1983); *Board of Trustees of Sheet Metal Workers v. Vic Constr. Corp.,* 825 F.Supp. 463, 466–67 (E.D.N.Y.1993) (adopting the *Winston* analysis as based on "general contract principles" to uphold an oral settlement of an ERISA case).

█ In discerning the parties intent "[w]hat matters are the parties' expressed intentions, the words and deeds [of the parties,] which constitute objective signs in a given set of circumstances." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *see Church of God of Prospect Plaza v. Fourth Church of Christ, Scientist, of Brooklyn,* 76 A.D.2d 712, 714, 431 N.Y.S.2d 834, 837 (2d Dep't 1980), *aff'd,* 54 N.Y.2d 742, 442 N.Y.S.2d 986, 426 N.E.2d 480 (1981). Applying New York law, a four factor test is used to determine whether these objective signs prove a binding agreement: (i) whether there was an express reservation between the parties not to be bound absent a formal writing; (ii) whether one party has partially performed the contract; (iii) whether there are material terms left to be negotiated; and (iv) whether it is the type of agreement that is usually reduced to a writing. *Ciaramella v. Reader's Digest Assoc., Inc.,* 131 F.3d 320, 323 (2d Cir.1997); *see also* Restatement (Second) of Contracts § 27 cmt. c (1981).

Considering these factors in the context of this case, a jury would be required to find that a binding and enforceable agreement was reached even though there was no explicit agreement on terms and no execution of a final document satisfactory in every respect to both sides.

i. Express Reservation

█ Under New York law, oral agreements are binding except where the parties have explicitly made reference to an intention to be bound only by an executed written document. *See Scheck v. Francis,* 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493 (1970); *Davidson Pipe Co., Inc. v. Laventhol and Horwath,* 1986 WL 2201, at *5 (S.D.N.Y. Feb.11, 1986) (oral statement "we have a deal" insufficient to bind parties who have reserved right to be bound only by an executed contract). If the parties have reserved the right to be bound only by a written formal contract, "they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis,* 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493 (1970). Where there is no understanding that an agreement will not be binding until reduced to writing and formally executed, and "[w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement," an oral promise or handshake is all that is needed to effectuate the contract. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 149, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143 (1979). Courts must give considerable weight to the statements of the parties to avoid frustrating their intentions. *See id.*

ii. Partial Performance

█ Partial performance under New York law and general contract principles is a significant factor in determining not only the existence of a binding oral agreement but in constructing terms. *See Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 1070–71, 392 N.Y.S.2d 252, 253, 360 N.E.2d 930 (1976); *cf.* E. Allan Farnsworth *Contracts* § 3.15, at 158–59 (retaining product in silence). " '[W]here the parties have completed their negotiations of what they regard as essential elements, and performance has begun ... the court will find and enforce a contract....' " *Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 1070, 392 N.Y.S.2d 252, 253, 360 N.E.2d 930 (1976) (quoting trial court).

iii. Material Terms Remaining to Be Negotiated

█ A third factor in determining the existence of a valid contract is whether there

was nothing left to negotiate or settle, so that all that remained to be done was to reduce the agreement to writing and sign. *See Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 148–49, 417 N.Y.S.2d 218, 219–20, 390 N.E.2d 1143 (1979). Only if essential terms are omitted or indefinitely phrased, will the agreement be unenforceable. *See Ellenberg v. Schneider,* 109 Misc.2d 1058, 1062, 441 N.Y.S.2d 581, 585 (N.Y.Sup.Ct.1981); *Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978).

 In the context of employment agreements, "[t]he general rule is that price is an essential ingredient." *Ellenberg v. Schneider,* 109 Misc.2d 1058, 1062, 441 N.Y.S.2d 581, 585 (N.Y.Sup.Ct.1981); *see also Hurwitz v. Gleicher,* 284 A.D. 1056, 1057–57, 136 N.Y.S.2d 35 (2d Dep't 1954); *Saunder v. Baryshnikov,* 110 A.D.2d 511, 512, 487 N.Y.S.2d 51, 52 (1st Dep't 1985) (nebulous comments were not enforceable). While it is not necessary that the exact amount be stated, the price must, by the terms of the agreement, be capable of being ascertained. *See Hurwitz v. Gleicher,* 284 A.D. 1056, 1056–57, 136 N.Y.S.2d 35, 36 (2d Dep't 1954).

Even if parties have failed to mention a material term, it may be implied. *See Cobble Hill Nursing Home, Inc. v. Henry & Warren,* 74 N.Y.2d 475, 483–85, 548 N.Y.S.2d 920, 923–25, 548 N.E.2d 203 (1989). "[A] price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties." *Id.* at 483, 548 N.Y.S.2d 920, 548 N.E.2d 203.

 New York will look to industry standards to determine whether a reasonable critical term may be supplied, "based on proof of established custom and practice in the industry." *Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 1070, 392 N.Y.S.2d 252, 252–53, 360 N.E.2d 930 (1976). " 'If the contract can be rendered certain and complete, by reference to something certain, the court will fill in the gaps.' " *Id.* at 1071, 392 N.Y.S.2d 252, 360 N.E.2d 930 (quoting trial court).

iv. Type of Agreement Usually Reduced to a Writing

The final factor in deciding whether a term must reduced to writing "is whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 76 (2d Cir.1984). Standards and customs of the industry are critical. *See Manufacturers Hanover Trust Co. v. Margolis,* 115 A.D.2d 406, 407–08, 496 N.Y.S.2d 36, 37 (1st Dep't 1985).

v. Consideration

 Defendants also contend that a promise to give ten percent of the gross proceeds of the Syndication Agreement to plaintiff was predicated on past consideration. "In the absence of a writing that can be understood without dependence upon extrinsic evidence and that clearly describes the consideration, a promise derived from past consideration is simply not actionable." *Clark v. Bank of New York,* 185 A.D.2d 138, 140–41, 585 N.Y.S.2d 749, 751 (1st Dep't 1992). *See also* E. Allan Farnsworth, *Contracts,* § 2.7, at 52 (2d ed.1990) (" 'past consideration'—action already taken before a promise is made—cannot be consideration for the promise"). New York's section 5–1105 of its General Obligation law provides that a writing may avoid this rule:

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

V. Application of Law On Existence of Contract to Facts

 ▪ The evidence of relevant factors is overwhelmingly in favor of the plaintiff's contention that a binding and enforceable agreement was concluded. The parties have unequivocally stated that they intended to bind themselves without any reduction of the

agreement to writing. This expression of the parties, coupled with standards and customs in the industry relying on oral agreements, leads to the conclusion that a formal writing was not contemplated or expected.

The evidence is uncontested that employment agreements in the horse racing industry are rarely reduced to writing. Expert witnesses for both sides testified that oral employment agreements are standard in this trade. Tr. at 18; Tr. at 38. This factor alone is compelling in suggesting that an agreement was reached, and that the parties expected to be bound.

Performance by the parties supports this conclusion of agreement. During the course of plaintiff's employment he received a per diem rate of $108 per day and 10% of the horse's winnings which amounted altogether to $132,486. As to the additional compensation component of the contract, plaintiff was given a valuable lifetime breeding right pursuant to the Syndication Agreement. Plaintiff has accepted the yearly breeding right as additional compensation each year for fourteen years.

The relatively straight-forward nature of this agreement also indicates that the parties intended to be bound in the absence of an executed document. There is no commercial complexity here.

The sole serious issue between the parties is whether the ambiguous "additional compensation" reference renders this agreement unenforceable. While compensation is a necessary component of any oral employment contract, the intricate system of gap fillers in the equine industry more than adequately provides necessary guidance for the construction of the contract's terms.

Reasonable construction of the compensation requirement in the context of business and trade expectations comports with both New York law and the growing trend in modern contract law in the United States and elsewhere to relax formal requirements for a contract. *See* Eyal Zamir, *The Inverted Hierarchy of Contract Interpretation*, 97 Colum.L.Rev. 1710, 1750 (1997). This flexibility includes relaxing the former rigidly imposed requirement of certainty of terms.

Whereas in the past some courts found many agreements unenforceable due to indefiniteness, modern legislatures and courts—particularly those in New York—are willing to enforce fair contracts "even where many terms are missing" to reflect the expectations of honest business people. *See* Zamir, *supra*, at 1750–51 & n. 163. This denigration of a formalistic approach to contract interpretation focuses on equitable and ethical considerations of fairness. It allows the recognition and enforcement of agreements that previously might have failed.

The intentions of the parties to be bound and the incorporation of the standards and custom of the industry into the agreement by implication provides sufficient basis to ascertain compensation. Defendants' contention that a 10% value of the syndication value of the horse is unascertainable is without merit. Assuming that the agreement was for 10% of the syndication value, this sum is capable of being ascertained. The Syndication Agreement itself divides the horse into forty equal shares, each one of which has a definite value. In determining the value of these shares the United States Tax Court has found that both the individual syndication share as well as the overall syndication value of the stallion may be determined using traditional accounting methods. *See generally Pessin v. Commissioner*, 59 T.C. 473, 1972 WL 2491 (1972). While the values of shares may fluctuate, similarly to market traded stock, *see* Tr. at 11–12, it is possible at any given time to determine ten percent of the value of all forty shares.

The unambiguous expressions of the parties in light of industry custom controls. A ruling of no contract would run counter to the expectations of all individuals who enter into similar agreements within the horse racing industry. Such contravention of custom would allow outworn ideology to override living tradition. *See* Restatement (Second) Contracts § 90 (1981). Defendants' assertion that the contract is unenforceable because it is predicated on invalid past consideration lacks merit. There was ample consideration in plaintiff's vital work in training this championship horse after the agreement was reached.

## VI. Statute of Frauds

■ Defendants raise the issue, for the first time in their post-hearing memorandum, that the oral agreement is unenforceable because it fails to satisfy New York's statute of frauds. That ordinance provides in relevant part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: 1. By its terms is not to be performed within one year from the making thereof. . . .

N.Y.Gen.Oblig.Law § 5–701(a). Since the horse could have died at any point or could have been sterile (thus having no syndication value), it is doubtful that section 5–701(a) has any bearing.

The required memorandum may consist of several documents only some of which must be signed, provided that they clearly refer to the same transaction. *See generally Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E.2d 551 (1953). There is ample documentation evidencing the full contract, the only question being one of interpretation, a matter discussed in Part VIII *infra.*

■ Defendants also contend that the transaction is a sale of goods under Article 2 of the Uniform Commercial Code and, therefore, must be in writing. Article 2 of the code applies "to transactions in goods." U.C.C. § 2–102. The sale of a race horse is a sale of goods. *See Presti v. Wilson,* 348 F.Supp. 543, 545 (E.D.N.Y.1972). The sale of fractional interests in a race horse to a number of parties pursuant to a syndicate agreement is also a sale of goods under U.C.C. *See* Kropp, *supra,* at 173–75.

The contract, however, is one of employment of the plaintiff, the syndication share being only one of the claimed elements of compensation. Thus, the Uniform Commercial Code has no bearing. Moreover, the numerous letters that evidence the employment relationship fully satisfy the writing requirement. So too would the equitable doctrine of partial performance under section 5–703(4) of New York General Obligation

law, since part performance was "unequivocally referable" to the oral agreement. *Gracie Square Realty Corp. v. Choice Realty Corp.,* 305 N.Y. 271, 279–80, 113 N.E.2d 416, 420 (1953).

■ The statute of frauds was designed to prevent "fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury," *D & N Boening, Inc. v. Kirsch Beverages,* 63 N.Y.2d 449, 453, 483 N.Y.S.2d 164, 165, 472 N.E.2d 992 (1984), not " 'to afford persons a means of evading just obligations.' " *Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 574, 297 N.Y.S.2d 947, 952, 245 N.E.2d 712 (1969) (quoting 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 567A, at 19–20 (3d ed.1959)). There is no hint of fraud here. This was an employment agreement, largely completed. The only real issue is the meaning of the agreement.

## VII. Statute of Limitations

■ The statute of limitations under New York law for a common law breach of contract action is six years. *See* N.Y.C.P.L.R. 213. Plaintiff claims that defendants promised him 10% of the gross syndication price after the syndication was "complete." Complaint at 5; Pl.Opp.Sum.J. at 1–2, 22. Plaintiff also alleges that defendants "renewed" the promise every year between 1983 and 1993. Dep. J. DiMario, Vol. 2, at 65. He contends that in light of the fact that only twenty nine of the forty shares provided in the syndication agreement were sold, the syndication was never complete, and it was not until 1993 that defendants repudiated the contract.

Two questions are raised: first, when was the syndication of the horse sufficiently complete so that the six year statute of limitations began to run, and second, if not complete, at what point, if ever, did the defendants repudiate?

The syndication agreement provides, as already recited, the traditional forty fractional interests and one lifetime breeding right to the plaintiff. Syndicate Agreement § 4.2(a). The first ten shares of the horse were sold immediately after syndication in March of 1983; another nineteen shares were sold

over the next ten years. Tr. at 3–4. Some shares remain unsold.

The exact point at which syndication is complete was clarified by expert testimony. Defendants' expert testified without substantial contradiction that upon sale of one fractional interest the horse is syndicated.

Q. When is a horse considered to be syndicated?

A. When there is a syndicate agreement that is drawn up and there is more than one person that owns the horse. There is a sale of one share.

Q. So upon the sale of one share of the syndication that horse is considered to be syndicated?

A. Yes. . . .

Q. You heard discussion when a syndication is completed. Is there a way—is that term that's used in the equine industry and is that a way to describe the process of syndication, this idea of when a syndicate is completed?

A. My definition of completion of the syndicate would be when you sold one share of the syndicate. . . .

Tr. at 10–11.

Plaintiff's expert refused to give an unequivocal answer to the question:

Q. You testified, or the question was asked by Mr. Langsam, when is a syndication completed, and you answered that when the last share is sold then you can determine the value . . . . And when would you consider a syndication agreement complete at the completion of the selling of all 40 shares?

A. Certainly would be good, okay indication all shares have been sold, yes.

Q. And you also testified that if one share is sold you wouldn't consider it complete; correct?

A. As far as evaluation is concerned, I don't know the legality of it.

Q. Well, the question was asked of you, when would you consider it complete, and I'm trying to figure out where between one and 40 shares would you consider it complete?

A. I can't help you, sorry.

Q. Does it require all forty shares to be sold?

A. I don't know.

Tr. at 68–69.

It is unsatisfactory to require that the completion of syndication require the sale of the final share for purposes of the statute of limitations, since all shares may not be sold during the horse's breeding lifetime. Upon the sale of the first share pursuant to the syndication agreement the defendants were fully capable of conveying the value of a fractional interest to the plaintiff.

The statute of limitations began to run either on the sale of the first share of the syndicate in 1983 or when plaintiff obtained knowledge of the syndication. There is no doubt that he knew of syndication at or shortly after the event. This would have foreclosed the defendants' right to bring suit as early as 1989.

Plaintiff was put on notice in March of 1983 that the syndicate agreement did not provide him with any rights or interests over and above one lifetime breeding right. Syndicate Agreement § 4.2(a). This may be considered a repudiation of the alleged contract, from which point the statute should be measured, barring the suit.

Plaintiff also relies on the alleged yearly "renewals" of the agreement by the defendants as creating a new date from which to measure the statute of limitations. This argument is not convincing in light of the explicit language of the syndication agreement which provides only one lifetime breeding right, exercised each year by the plaintiff.

It is not necessary to place the decision on a bar of the statute of limitation since the contract was fully performed by the defendants in accordance with the custom of the industry. It is this central issue of construction that is discussed below.

VIII. Construction of Terms of Oral Agreement

 Since there was a valid contract, it must be determined what were the con-

tract terms. Under New York law "parties to a contact on a subject-matter concerning which known usages prevail are deemed to have incorporated such usages, by implication, into their agreement, if nothing is said to the contrary." *Schipper v. Milton,* 51 A.D. 522, 64 N.Y.S. 935, 937 (1st Dep't 1900), *aff'd,* 169 N.Y. 583, 62 N.E. 1100 (1901). "Whether ... terms are ambiguous is a question of law [to be] decided by the court." *See Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568, 573 (2d Cir.1993).

Construing terms, courts have relied on the Llewellyian interpretive model which focuses on the express terms of the contract, followed by plain meaning and only as a last resort turns to external interpretive tools. In the esoteric world of the Thoroughbred horse racing industry this sequence is not useful since the meaning of the terms of the agreement are defined by the customs and norms of the industry. In construing the contract in such a trade, the courts must turn to alternate means. This path (described as "the inverted hierarchy of contract interpretation") is broken into steps in which trade usage is central. As professor Zamir put it:

> the parties' intentions are to be deduced from the totality of the contract's documents, and then from the circumstances surrounding its making. The next step is to examine whether an answer may be found in the parties' previous course of dealing. Should uncertainty as to the contract's meaning remain, *the interpreter fills the gap in the contract by reference to trade usages.* If these are not useful, statutory or judge-made default rules are applied to supplement the contract. Finally, if there is no definite answer even in the default rules, general principles of contract law, such as good faith or the realization of reasonable expectations, may be resorted to.

Eyal Zamir, *The Inverted Hierarchy of Contract Interpretation,* 97 Colum.L.Rev. 1710, 1712 (1997) (emphasis added).

The parameters of a contract within the horse industry are gauged by course of performance, course of dealing, and usages of the trade. New York courts have followed this rationale, filling in any gaps left by the parties provided:

> "some objective method of determination is available, independent of either party's wish or desire. Such objective criteria may be found in the agreement itself, commercial practice or other usage and custom."

*Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 1071, 392 N.Y.S.2d 252, 253, 360 N.E.2d 930 (1976) (quoting trial court); *see also* Edwin W. Patterson, *The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 838–52 (1964). A usage of trade is a "practice ... having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." U.C.C. § 1–205(2); *see also* E. Allan Farnsworth, *Contracts* § 7.13, at 528–36 (1990).

These interpretive tools fit neatly within the dynamic of the horse industry since "[t]he horse business has a very well-developed set of trade customs and usages that are peculiar to the equine industry." John C. Kropp, et al., *Horse Sense and the UCC: The Purchase of Racehorses,* 1 Marq. Sports L.J. 171, 183 (1991). Trade usage and performance are the foundation of most agreements in the industry. Acquiescence in the standards and customs within the industry defines the expectations and intentions of trainers and horse owners.

Custom, as demonstrated by the expert testimony, indicates that a trainer is paid a day rate, a proscribed amount of money for the general care of the animal which is also intended to cover all out of pocket expenses of the trainer for materials and special labor such as blacksmiths, veterinarian services and special wraps. Tr. at 12; Tr. at 51. It is also customary for the trainer to receive ten percent of the horse's winnings at races during the duration of his employment. Tr. at 11; Tr. at 51. If the horse is successful, it is customary for the trainer to receive one lifetime breeding right. Tr. at 13; Tr. at 53. These customs must be construed as implied precise terms of the original contract.

The question of additional compensation as defined by standard and custom in the indus-

try was unequivocally answered by both the plaintiff's and defendants' experts as being limited to one lifetime breeding right. No substantial example of a deviation from this norm was supported by any evidence. The plaintiff's expert testified that although he reviewed two to three hundred syndication agreements, Tr. at 50, he could only cite two that differed from the uniform custom. Tr. at 54.

Q. Are you familiar with any trainers who have received as part of their compensation excess of a breeding zone?

A. The difficulty of finding it, it is a closed kind of business and not very much is written ... So, what I did, I tried to call around and see if I could find from some of the people I do business with, if they could give me some examples that they heard about, and they came up with at least four examples, which I then conveyed to you as to people who got more than a—these are all successful trainers.

. . . . .

Q. In your opinion, 10 percent of the syndicated value depends on Runaway Groom's success?

A. Certainly ... saying, I'll give you 10 percent of the value it's not unheard of. I only heard of it a couple of times myself. . . .

Tr. at 40–44.

The uncontested testimony establishes that the standard and custom of the industry is to provide one lifetime breeding right as additional compensation for successful trainers and from this custom deviation is rare. As the plaintiff's expert testified on cross examination:

Q. Generally a trainer of a successful horse that goes to syndication will receive a lifetime breeding right; is that true or not?

A. If a horse wins a grade one stake, let's keep it to the example of Runaway Groom. I have heard most trainers that win grade one stakes, at least received a lifetime breeding right. They may first be offered a share or a part of it something different, but they certainly end up normally with lifetime breeding right.

Tr. at 53.

The evidence supports a determination that the standard and custom is to confer only one lifetime breeding right to the trainer. Even the trainer of perhaps the greatest race horse of all time, Secretariat, received only one lifetime breeding right as additional compensation. Thomas Kiernan, *The Secretariat Factor* 13 (1979); *cf. Gaillard v. Hancock,* 111 F.3d 138 (table), 1997 WL 187408, at *1 (9th Cir.1997) (even though the trainer was also a part owner, he "would be entitled to one [additional] breeding right, as was customary for the trainers"). The defendants have satisfied all obligations under the oral employment contract.

## IX. Unjust Enrichment

Plaintiff's remaining contentions do not warrant extended discussion. Although the complaint purports to state a cause of action for unjust enrichment, it is well settled that absent certain circumstances not present here, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick Inc. v. Long Is. R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). A full and clear oral agreement will also bar a claim for unjust enrichment in the absence of overreaching. Since plaintiff's claim for unjust enrichment arises out of the same subject matter governed by the oral agreement, the existence of that contract bars any cause of action sounding in quasi contract. *See id.* at 389, 521 N.Y.S.2d 653, 516 N.E.2d 190.

## X. Conclusion

The defendants' motion for summary judgment is granted, with no costs or disbursements.

**SO ORDERED.**