**Stanley J. SHAFTEL, Plaintiff,**

v.

**Aly S. DADRAS, Defendant.**

**No. 96–CV–4114(JS).**

United States District Court,
E.D. New York.

Feb. 10, 1999.

Robert V. Dienstag, Wachstock & Dienstag, Great Neck, NY, Mathew E. Hoffman, Todtman, Nachamie, Spizz & Johns, PC, New York City, for plaintiff.

Gordon W. Paulsen, Healy & Baillie, New York City, for defendant.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court, pursuant to its diversity jurisdiction, is Defendant's motion for summary judgment in this dispute involving an alleged contract. Plaintiff is asserting claims for monies due under oral contracts purportedly entered into

with Defendant. Defendant asserts that even assuming such oral contracts existed, Plaintiff's claims are barred by the applicable statute of limitations and statute of frauds.

## BACKGROUND

During the relevant time at issue, Defendant Aly S. Dadras ("Dadras"), and Plaintiff Stanley J. Shaftel ("Shaftel"), were architects licensed to practice in the State of New York. Both parties served as professors in the Department of Architecture at New York Institute of Technology ("NYIT"). Shaftel served as an adjunct professor while maintaining a full time architectural practice. (Shaftel Aff. ¶ 4.) Dadras, on the other hand, was a full time professor for NYIT. (Dadras Dep. ¶ 4.) The record indicates that both parties were professional colleagues and friends for approximately thirty years. (Dadras Dep. at 416, 209; Shaftel Aff. ¶ 2.) At certain times during the mid–1970's and early 1980's, Dadras shared office space in Shaftel's architectural practice. During this time, Dadras paid Shaftel rent and reimbursed him for expenses. (Shaftel Aff. ¶¶ 5, 11, 15, 24.) In a letter dated July 27, 1975, written to Shaftel, Dadras characterized himself as a "tenant ... in the office of Stanley J. Shaftel." (Dadras Aff. ¶ 2; Ex. A.)

While working as a full time professor, Dadras embarked on numerous business ventures involving architectural projects and conducted business under the trade name of Dadras International. (Dadras Aff. ¶ 5.) Shaftel claims that Dadras lacked the resources to independently engage in the business ventures of the magnitude at issue in the instant action. Accordingly, Shaftel alleges that Dadras procured Shaftel's "help" and they agreed to a joint venture (hereinafter the "Agreement"), whereby Shaftel would receive ten percent of the gross proceeds from all projects that the parties worked on together. (Shaftel Aff. ¶¶ 5, 23.) It is undisputed that this "Agreement" was never memorialized in a written document. The parties have stipulated that Shaftel was never an employee of Dadras or Dadras International. (Dadras Aff. ¶ 6; Shaftel Dep. at 31–33.)

## I. THE PROJECTS IN IRAN

On numerous occasions, Dadras traveled to Iran on business and entered into several contracts requiring architectural expertise.

### A. Kan Project

The first such project required Dadras and Dadras International to perform structural calculations and alterations relating to the proposed Kan Residential Project in Tehran, Iran ("Kan Project"). Shaftel alleges that he did work on the Kan Project for which he never received compensation, and pursuant to the Agreement he asserts a claim for ten percent of the gross proceeds. (Shaftel Aff. § C. n.1.) The Kan Project was finalized sometime in 1978.

### B. Shayhad Project

The second relevant project involved several agreements Dadras and Dadras International entered into with the Tehran Redevelopment Corporation ("TRC"). These agreements involved the construction of 5,000 residential units in the North Shayhad Development Project ("Shayhad Project"). (Hoffman Affirm. Ex. E.)

Dadras was referred to TRC by a business associate on the Kan Project. The parties believed that the Dyna–Frame–Celdex Construction System ("Dyna–Frame System"), which was proposed for the Kan project, would be ideal for the Shayad Project. (Hoffman Affirm. Ex. E ¶ 5.) The technology utilized by the Dyna–Frame System facilitated the expeditious erection of building structures in a manner far superior to traditional construction methods. (Hoffman Affirm. Ex. E ¶ 3).

Dadras initial meeting with TRC on March 29, 1978 proved successful, and TRC asked Dadras to redesign the exist-

ing structural system for the Shayhad Project so as to implement the Dyna–Frame System. TRC and Dadras entered into a preliminary agreement which was hand written, referred to as the "March 29 Agreement," which was eventually typed and subsequently referred to as the "April 3 Agreement." Upon returning to New York from his first meeting with TRC in Iran, Dadras met with several other individuals to review the March 29 Agreement. Shaftel was one of those people with whom he met, and as the record indicates, the only other architect involved. (Hoffman Affirm. Ex. E ¶ 12.)

While in New York, Dadras formed Per–Am Corporation for the purpose of providing construction, engineering and other building services in connection with the Shayhad Project.[1] (Dadras Aff. ¶ 19; Proposal and Contract for Shayhad Project, Dadras Aff. Exs. D & E; Shaftel Dep. at 269.) On June 14, 1978, in a meeting held in Tehran, Dadras and TRC executed the Proposal for the Shayhad Project (hereinafter the "June 14 Agreement" or the "Proposal"). The June 14 Agreement provided, in relevant part:

> 2. The Consultant [Dadras International] shall revise the structural system in the plans of Haus International in order to be able to adapt the alternate structural system [Dyna–Frame System] to be outlined hereinafter. These revisions shall be submitted within 60 days to the Owner for approval.
>
> 3. The Consultant shall coordinate the structural, architectural and mechanical work.
>
> F. TIME OF CONSTRUCTION: According to attached Schedule dated June 2, 1978.
>
> J. This PROPOSAL is subject to the approval of the Owner of the Alternate Structural System which is prepared by the Consultant as stated in Paragraph E2.

Neither party assumes any obligation under this proposal. After an agreement has been reached payment will be made according to the terms and conditions of the agreement.

(Dadras Aff. Ex. D.)

TRC provided Dadras with the existing drawings originally prepared by Haus International ("Haus"). (Hoffman Affirm. Ex. E ¶ 27.) TRC stated that Dadras and Dadras International would be required to complete the construction documents two months after TRC signed the Proposal in order for TRC to sign the prime contract for construction of the 5,000 unit Shayhad Project. (Hoffman Affirm. Ex. E ¶ 28.) A subsequent meeting was held with officers of Haus in New York on July 18, 1978. Haus had been responsible for designing the Shayhad project and Dadras met with them to discuss revisions of the existing drawings for adaptation to the Dyna–Frame System. At this meeting, several individuals represented Dadras and Dadras International, including Shaftel, who was the only other architect present. (Hoffman Affirm. Ex. E ¶ 30). The drawings were completed in accordance with the June 14 Agreement. Dadras presented TRC with a set of Dadras International's construction drawings, a 137–page guide to the Structural Calculations, a set of Drawing Guides for the Structural Calculations (consisting of 143 drawings) and a complete set of structural calculations totaling 1343 pages. (Hoffman Affirm. Ex. E ¶ 35.) Dadras told TRC that in order to meet the deadline "my associates and I had to work around the clock with very small rest periods in the last 60 days." (Hoffman Affirm. Ex. E ¶ 37.)

On August 27, 1978, TRC and Dadras met and reviewed the agreed upon terms to be included in the contract. Dadras also requested from TRC a letter acknowledging its approval of the construction documents and the agreed upon fee for Dadras International's services. (Hoffman

---

1. Dadras was President of Per Am and although Shaftel was an officer he was not a shareholder (Dadras Aff. ¶ 10, Shaftel Dep. at 180).

Affirm. Ex. E ¶ 41.) The letter signed by TRC's Managing Director, according to Dadras, "then became part of the contract." (Hoffman Affirm. Ex. E ¶ 42.)

On September 9, 1978, the contract was finalized and executed ("September 9 Agreement"). It identified TRC as "OWNER," Per Am as "BUILDER" and Dadras International as "CONSULTANT". (Hoffman Affirm. Ex. E. ¶ 44.) The agreement provided, in pertinent part:

> B. TIME OF CONSTRUCTION: According to the attached schedule dated June 2, 1978, and months shown adjusted to coincide with this contract.
>
> E2. The CONSULTANT shall be paid 5.4 percent of the total cost of the PROJECT which is ... U.S. Dollars 3,454,-929 for the work already completed for the design and preparation of the construction documents by computer of the Alternate Structural System. From the above payment, Dadras International shall receive ... U.S. Dollars 3,109,436
> ...
> E3. The CONSULTANT shall be paid 1.35 percent of the total cost of the project for construction supervision which is ... U.S. Dollars 863,732. From this, Dadras International shall receive ... U.S. Dollars 215,933 ...

(Dadras Aff. Ex. D.)

All told, Dadras entered into three separate agreements with TRC: (1) a preliminary agreement dated April 3, 1978 between Dadras International and TRC (the "April 3 Agreement"); (2) a proposal dated June 14, 1978 between Per–Am and TRC (the "June 14 Agreement"); and (3) the Contract dated September 9, 1978 between Dadras International, TRC, and Per–Am. (Hoffman Affirm. Ex. E ¶ 1.)

## C. Judgment of The Iran–United States Claims Tribunal at The Hague

Shortly after Dadras entered into the September 9 Agreement, the government of Iran was overthrown. Pursuant to an international agreement between the United States and Iran, the Iran–United States Claims Tribunal ("Tribunal") was established in The Hague on or about January 18, 1981. Dadras brought an action against TRC and Iran based on the Shayad Project Agreements. In "The Hague Affidavit," Dadras stated that "On October 18, 1978, Dr. Darehshury called me from Tehran and said that he had not been able to talk to Mr. Golzar [managing director of TRC] about the payment owing to Dadras International. He added that many offices and agencies were on strike and the situation in Tehran was not good." (Hoffman Affirm. Ex. E ¶ 46.) Dadras considered the $3,109,436 under the September agreement as an "outstanding" fee owed by TRC to Dadras International. (Hoffman Affirm. Ex. E ¶ 51.) He also stated that TRC failed to proceed with the construction of the project and had deprived Dadras International of further fees and Per–Am of profits to be earned from the Shahyad's project's construction. On November 9, 1995, the Tribunal awarded Dadras $3,109,436.00, plus simple interest calculated from September 9, 1978. However, the court denied the claim for construction supervision fees as too speculative. (Dadras Aff. In Support of Summary Judgment, Exh. F). Dadras was paid in November 1995.

Shaftel claims he had entered into an agreement with Dadras pursuant to which he would receive ten percent of the gross proceeds from this project. After the Iranian revolution, Shaftel maintains that Dadras subsequently agreed that Shaftel would receive ten percent of any award from the Tribunal. Shaftel concedes that neither he, nor any of his employees, ever initialed, signed or certified any of the drawings relating to the Shayhad project. Further, Shaftel presents no record of any work that he or his employees performed on the project. (Dadras 56.1 Statement of Material Facts Pursuant to Local Civil Rule 56.1 (hereafter "56.1"); Shaftel 56.1.) To buttress his claim, Shaftel submits the sworn affidavits of: (1) Moussa Yeroushal-

mi, a business acquaintance; (2) Corinne Shaftel, Shaftel's wife; and (3) Alireza Vafaee, a former student of Shaftel and Dadras and a former Dadras employee. All three affidavits support the premise that Dadras promised Shaftel ten percent of the Tribunal award.

Shaftel also alleges that in or about November 1995, Dadras proffered Shaftel two checks totaling $35,000.00 in payment "for professional services" after purportedly telling him he received an award of $350,-000.00 from the Hague Tribunal. (Shaftel Aff. ¶ 33.)

## II. THE DOMESTIC PROJECTS

In addition, Dadras performed work on projects in the United States to which Shaftel asserts a claim.

### A. The New York Chiropractic College

In or about 1981, Dadras performed architectural work on a project for The Research Center of the Chiropractic College in New York (the "New York Chiropractic Project"). (Dadras Aff. ¶ 39.) Shaftel claims that at the inception of the project both parties agreed that Shaftel would receive ten percent of the gross profits from this project, but that Shaftel would have to wait until Dadras received an award from The Hague Tribunal for the payments. (Shaftel Aff. ¶ 22.)

Dadras was paid $351,000.00 for architectural services and an additional $242,-000.00 in outstanding fees pursuant to an arbitration award. Dadras claims, and no evidence has been presented to the contrary, that he received the arbitration award in 1988. Shaftel admits knowing that Dadras received an arbitration award. (Shaftel Aff. ¶ 22.) Both parties stipulate that Dadras received payment for his work more than six years prior to the commencement of this action. (Dadras 56.1 ¶ 40, Shaftel 56.1 ¶ 40; Dadras Aff. ¶¶ 42–43, Shaftel Dep. at 124–25.)

Shaftel claims that his involvement in the project consisted of attending meetings and drafting drawings. This is corroborated by an affidavit of Alirezea Vafaee submitted by Plaintiff into the record. Shaftel also submits evidence of memoranda taken by the lawyers of New York Chiropractic during numerous meetings. The memos reveal that Dadras acknowledged working on many projects with Shaftel in the past, and that Shaftel would be working with him on the New York Chiropractic Project as his "associate." No other work records currently exist with respect to this project.

### B. The Islamic Cultural Center Project

Shaftel also claims that he worked with Dadras on the Islamic Cultural Center Project. In or about 1984, Dadras International performed architectural work on a project for the Islamic Cultural Center in Manhattan ("Islamic Center Project"). Dadras was initially paid $791,100.00 and received an additional $471,599.00 pursuant to an arbitration award rendered in 1988. (Dadras Aff. ¶¶ 36, 37.) Shaftel claims he was unaware that Dadras had been paid $791,100.00 apart from the arbitration award, and although he was cognizant of the award in 1988, he was unaware of the amount, notwithstanding the fact that he testified on behalf of Dadras at the arbitration proceedings concerning the work he performed on the project. (Shaftel Aff. ¶¶ 24, 26.)

Neither Shaftel, nor any of his employees, initialed, signed, or certified any of the drawings that he allegedly worked on relating to the Islamic Center Project. (Shaftel Dep. at 148–49.) Shaftel has no records of any of the alleged work on this project, although he claims that he does not ordinarily retain records when another architect was responsible for the final drawings. (Shaftel Aff. fn. 3.)

Shaftel and Dadras purportedly reaffirmed their Agreement that Shaftel would be entitled to ten percent of the gross proceeds received from the project. (Shaftel Aff. ¶¶ 23, 24.) Shaftel also alleges that at the inception of the Islamic Center Pro-

ject both parties agreed that Shaftel would await the decision on the Shayhad Project by the Hague Tribunal before he would be entitled to receive the promised ten percent share from the Islamic Center Project proceeds. (Shaftel Aff. ¶ 10.)

Shaftel submits affidavits by Abraham Hertzberg and Alizea Vafaee corroborating Shaftel's work on the Islamic Center Project. Hertzberg was consulted various times by Shaftel pertaining to the Islamic Center Project, (Hertzberg Aff. ¶¶ 1–4.), and Vafaee recounts observing Shaftel provide drawings for the Islamic Cultural project. (Vafaee Aff. ¶ 8.)

C. · Resorts International

It is undisputed that Dadras and Shaftel worked together on the Resorts International Project together. (Hoffman Affirm. Ex. E ¶ 51; Hoffman Affirm. Ex. B: Dadras Resp. to Interrogs.) Shaftel claims that the parties agreed that he would be entitled to ten percent of the gross proceeds. Shaftel and his employee purportedly worked in excess of 380 hours on this project. (Shaftel Aff. ¶ 30.) Once again, Shaftel asserts that payment was not to be made until after the decision at Shahyad. (Shaftel Aff. ¶ 31.)

Shaftel seeks recovery in the amount of $600,000.00 plus interest based on ten percent of the Tribunal Award in connection with the defunct Shayhad project; and (2) 78,000.00 plus interest based on ten percent of the sum of the gross proceeds of the domestic projects (Islamic Cultural Center, New York Chiropractic, Resorts International).

DISCUSSION·

I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGEMENT

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)).

The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)). A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

Under the law of the Second Circuit, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to

the material facts.'" *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)(internal quotations omitted).

In the context of a contractual dispute, summary judgment may be granted where the contract conveys a "definite and precise meaning absent any ambiguity," *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992), and under New York law, whether contract language is ambiguous is a question of law properly resolved on a motion for summary judgment. *Id.; see also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989) (finding summary judgment "perfectly appropriate" where intent can be ascertained).

It is within this framework that the Court addresses the present summary judgment motion.

## II. LAW TO APPLY

Jurisdiction in this action is based upon diversity of citizenship as Plaintiff Stanley J. Shaftel is an individual residing in the State of Nevada and Defendant Aly S. Dadras is an individual residing in the State of New York. A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In contract cases, New York courts apply a "center of gravity" or "grouping of contacts" approach. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997).

The relevant factors or contacts include the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936 (1993). The controlling considerations are the place of contracting and the place of performance. *Id.* Public policy considerations, however, may trump this determination "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Id.* at 226, 597 N.Y.S.2d at 907, 613 N.E.2d 936. In the instant action, the relevant factors require application of New York law, to which neither party disputes.

## III. THE EXISTENCE OF AN ORAL CONTRACT

Although Defendant states in a conclusory fashion that the purported Agreement was contrived and never existed in fact, he does not specifically challenge the existence of the essential elements of contract formation, which will be addressed briefly herein. The law of New York applies well established common law contract principles to determine whether parties to an action intended to form a binding agreement. *See Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir.1997). "Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. . . . In any given case it is the intent of the parties that will determine the time of contract formation." *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985). The parties intent should be discerned from the totality of the circumstances. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) ("What matters are the parties' expressed intentions, the[ir] words and deeds which constitute objective signs in a given set of circumstances."); *Board*

*of Trustees of Sheet Metal Workers v. Vic Constr. Corp.,* 825 F.Supp. 463, 466–67 (E.D.N.Y.1993).

■ A four factor test is used to determine whether the parties intended to be bound by their agreement: (1) whether there has been an express reservation between the parties not to be bound absent a formal writing; (2) whether one party has partially performed the contract; (3) whether there are material terms left to be negotiated; and (4) whether it is the type of agreement that is usually reduced to a writing. *Ciaramella,* 131 F.3d at 323.

■ In the case at bar, no evidence in the record indicates a reluctance to agree without a formal writing, rather, it appears that they parties relied entirely upon each others' word. Based on Shaftel's claims and supporting evidence, partial if not complete performance was rendered by Plaintiff, and no further negotiations appeared necessary. Further, the record is bereft of evidence pertaining to the architectural industry's custom or practice respecting contracts between architects. Finally, "[w]hether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 576 (2d Cir.1993). Although Defendant asserts that an agreement was never reached, Plaintiff has presented sufficient evidence to survive summary judgment.

## IV. STATUTE OF LIMITATIONS

The Defendant asserts a statute of limitations defense against Plaintiff's breach of contract and restitution claims, with respect to the New York Chiropractic Project and the Islamic Center Project and "any sum received by the Defendant before August 30, 1990."

■ In New York, the statute of limitations applicable in actions based on breach of contact or restitution is six years. N.Y. C.P.L.R. 213(2) (McKinney 1996). As with any statute of limitations, however, the time limit only begins to run when a cause of action accrues. *See Continental Cas. Co. v. Stronghold Ins. Co. Ltd.,* 77 F.3d 16 (2d Cir.1996). It is well established under New York law that "a cause of action for breach of contract accrues and the statute of limitations begins to run when the contract is breached." *Raine v. RKO General, Inc.,* 138 F.3d 90, (2d Cir.1998) (quotations omitted); *Ely–Cruikshank Co., Inc. v. Bank of Montreal,* 81 N.Y.2d 399, 599 N.Y.S.2d 501, 502, 615 N.E.2d 985 (1993). Generally, the limitation period begins to run irrespective of whether a plaintiff has knowledge that a cause of actions exists. *Roberts v. Plottel,* No. 95 Civ. 10021, 1996 WL 306570, at *1 (S.D.N.Y. June 7, 1996). The New York Court of Appeals has stated that the statute commences at breach "even though no damage occurs until later" and the injured party may be ignorant of the wrongful act which has resulted in a breach of the contract. *T & N PLC v. Fred S. James & Co. of New York, Inc.,* 29 F.3d 57, 60 (2d Cir.1994) (citing *Ely–Cruikshank Co.,* 599 N.Y.S.2d at 502, 615 N.E.2d 985). Thus, courts have applied the rule of accrual at breach even where the transgressing party conceals the breach. *Guild v. Hopkins,* 271 A.D. 234, 63 N.Y.S.2d 522, 531 (1946).

■ The doctrine of equitable estoppel, however, may bar a defendant from raising the statute of limitations defense if the "plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Whitney Holdings, Ltd. v. Givotovsky,* 988 F.Supp. 732, 746 (S.D.N.Y.1997). Further, when a fiduciary relationship exists between the parties, affirmative acts of concealment by the defendant may estop him from invoking the statute of limitations defense. *Id.*

Thus, the first issue to determine is when the breach occurred. It cannot be gainsaid that if breach were to have occurred when the work was performed, or

even at the moment Dadras was paid, Shaftel did not institute suit within the six year limitation period. The summons and complaint were filed on or about August 20, 1996, and therefore, ostensibly, any claims with respect to payments made prior to August 20, 1990 would be time-barred. As discussed *supra,* the New York Chiropractic Project work was performed by Shaftel in or about 1981 and the arbitration award was rendered in 1988. The Islamic Center project work was performed by Shaftel in 1984 and the arbitration award was also rendered in 1988. Shaftel was aware, in or about 1988, of the favorable arbitration awards, yet he failed to commence suit within the six year period.

Shaftel argues that if the Court were to find 1988 as the year in which the statute began to run, Defendant should be equitably estopped from asserting the statute as a defense. However, because the record indicates that Shaftel knew of these arbitration awards, such an argument is unavailing. It is immaterial that Shaftel did not specifically know that direct payments were previously received by Dadras from the project owners or the exact amount of the payments received; once he was aware that an award was rendered, Shaftel had an obligation to protect his claim within a six year period. Discovery would have then fleshed out the extent and timing of the prior payments received.

A similar analysis defeats Shaftel's argument that the accrual at discovery rule should apply. Assuming that Dadras wrongfully concealed from Shaftel the payments he received from the project owners, Shaftel was aware that Dadras received money from the arbitration awards for these projects. His failure to take timely action, in light of the information he was aware of, precludes this Court from equitably estopping Defendant from asserting that the claims are time-barred.

However, and critical to determination of this motion, Shaftel has asserted that the parties agreed that payment for these projects would not be made until The Hague Tribunal decision was rendered. As The Hague Tribunal award was rendered in or about 1995, if the parties contemplated such arrangement, the action was timely commenced. Conversely, if the parties did not agree that Dadras was to give Shaftel ten percent of the gross proceeds from the domestic projects upon receiving an award from The Hague Tribunal, then the causes of action based on breach of contract and restitution with respect to the Islamic Center Project and the New York Chiropractic project are time-barred.

A. The Effect of the Agreement

 Assuming arguendo the parties did agree that payment for the two projects at issue was to be deferred until Dadras received The Hague Tribunal award, such an agreement would effectively postpone the time of breach. "Where the right of action depends upon the happening of a contingent future event, the cause of action accrues and the statute begins to run only from the time when the event happens." *Blakeley v. Agency of Canadian Car & Foundry Co.,* 73 N.Y.S.2d 573, 575 (1947); *see also Lyons & Assocs., Inc. v. 16 East 48th Street Corp.,* 645 N.Y.S.2d 284, 286, 168 Misc.2d 915, 917 (Sup.1996).

Shaftel asserts that he agreed with Dadras, at the inception of the Islamic Center Project and the New York Chiropractic project, that ten percent of the gross proceeds from each project would be payable to Shaftel when an award from the Tribunal comes through. (Shaftel Aff. ¶¶ 22, 28). Assuming this was true, Shaftel's cause of action would have accrued in 1995, when Dadras was paid the Tribunal's award. Because Shaftel asserts that this was part of the initial agreement established with respect to the Islamic Center Project and the New York Chiropractic project, the breach did not arise until after the Tribunal award was rendered in 1995. The Court must accept as true the asser-

tions of the non-movant on a motion for summary judgment and this creates a genuine issue of material fact with respect to the parties intentions when they entered into the relevant agreements. Further, because the linking of the payment for the domestic projects to the Tribunal award was established at the inception of those respective agreements, as asserted, Defendant's argument that it represents an oral modification of an alleged pre-existing contract is without merit.

In addition, Defendant asserts a similar argument as it pertains to the Shayhad project. However, the cited General Obligations Law section is inapplicable. Defendant breached the alleged contract by failing to make payment, not upon completion of Shaftel's work, but upon receipt of payment from TRC. Because TRC never paid Dadras pursuant to the September 9 1978 agreement, there was no breach of the alleged Agreement until after receipt of the Tribunal award. Accordingly, Shaftel's agreement to accept ten percent of the Tribunal award is the equivalent of accepting ten percent of the gross proceeds, as opposed to ten percent of the contract price, and does not constitute a modification of the Agreement. Once the Iranian government was overthrown, payment could only arise pursuant to the terms of the Tribunal agreement and Shaftel's acknowledgment of same did not constitute a modification. *See, e.g., Dimario v. Coppola*, 10 F.Supp.2d 213, 222 (E.D.N.Y.1998) (upholding an oral contract because, in part, "the growing trend in modern contract law in the United States and elsewhere [is] to relax formal requirements for a contract"). "This denigration of a formalistic approach to contract interpretation focuses on equitable and ethical considerations of fairness. It allows the recognition and enforcement of agreements that previously might have failed." *Id.*

The Court notes that at first blush it may appear illogical for Shaftel to agree to undertake new work in the United States with payment to be based on the incertitude of a foreign tribunal's decision, however, the close relationship previously enjoyed between these two men and Shaftel's professed concern for Dadras' financial woes provides a realm of legitimacy to the claim. Such claims are further reinforced by the supporting affidavits and depositions. Moreover, resolution of matters so thoroughly tied to the parties' intent are best suited for a trier of fact to decide.

Accordingly, Defendant's motion for summary judgment based on a statute of limitations defense is denied as it pertains to Plaintiff's breach of contract and quantum meruit claims.

## V. STATUTE OF FRAUDS

Defendant also moves for summary judgment claiming Plaintiff's causes of action are precluded by the Statute of Frauds, which provides, in pertinent part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to charged therewith, or by his lawful agent, if such agreement ... [b]y its terms, is not to be performed within one year from the making thereof....

N.Y. Gen. Oblig. Law § 5–701(a)(1) (McKinney 1989).

The Statute of Frauds was intended to prevent "fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury," *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 452, 483 N.Y.S.2d 164, 165, 472 N.E.2d 992 (1984), and to ensure the existence of a valid agreement, not the inclusion of every item that the parties could have conceivably included. *See Lande v. Radiology Specialists of Kingston P.C.*, 806 F.Supp. 1084, 1091–92 n. 11 (S.D.N.Y.1992). "Moreover, '[t]he Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedg-

ing litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly made.'" *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F.Supp.2d 287, 300–01 (E.D.N.Y.1998) (quoting 4 Williston, Contracts § 567A, at 19–20 (3d ed.)).

The paramount issue presented is simple; did Dadras promise Shaftel ten percent of the proceeds of the aforementioned projects. There is evidence supporting Shaftel's claim that he provided ample assistance in the lucrative projects without receiving compensation, and such evidence is not suggestive of fraud.

▇▇▇ The New York Court of Appeals has stated that this provision of the Statute of Frauds applies only to contracts "which by their terms, have absolutely no possibility in fact and in law of full performance within one year." *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 366, 670 N.Y.S.2d 973, 975, 694 N.E.2d 56 (1998) (internal citations and quotations omitted). If the contract in question may be "fairly and reasonably interpreted such that it may be performed within one year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame." *Id.* (internal citations and quotations omitted); *see also Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 106 (2d Cir.1985) ("The one-year provision has been held not to preclude an oral contract unless there is not ... the slightest possibility that it can be fully performed within one year.") (internal quotations omitted). Typically, dispositive motions should be denied where issues of material fact exist with respect to whether a particular contract falls within the Statute of Frauds. *See Sussex Leasing Corp. v. U.S. West Fin. Servs., Inc.*, 877 F.2d 200, 202–03 (2d Cir.1989); *see also Goldberg v. Select Indus., Inc.*, 202 A.D.2d 312, 314, 609 N.Y.S.2d 202, 204 (1st Dep't 1994) (questions of fact pertaining to whether the alleged contract could be performed within one year precluded summary judgment).

▇▇▇ Assuming a contract between Dadras and Shaftel was formed with respect to the Shayhad Project, a reasonable interpretation suggests that performance by both parties was possible within one year of its making. Shaftel's claimed involvement related to the preparation of the architectural drawings and drafting services, not oversight of the underlying construction. Dadras maintains that the TRC Contract which provided for a three year construction period is the relevant contract to analyze, however, the Agreement reached by Dadras and Shaftel is what is at issue. Shaftel, the non-movant herein, claims that the Agreement called for him to work on various structural drawings, calculations and construction documents all of which were completed within one year. (Shaftel Aff. ¶¶ 8, 12.) By August 1978, the construction documents were completed and submitted to TRC for approval. (Hoffman Affirm. Ex. E.) Indeed, the September 9 agreement recognizes that the work for the design and preparation of the construction documents was already "completed" and specified compensation in the amount of $3,109,436.00. (Hoffman Affirm. Ex. D.)

The record belies Defendant's argument that Dadras International could not have received payment within one year and therefore could not have paid Shaftel within one year. Indeed, Dadras characterized the $3,109,436.00 as "owed" and "outstanding" as of October 18, 1978. (Hoffman Affirm. Ex. E ¶¶ 35–46.) TRC itself perceived the above stated amount as "payment owing to Dadras International." (Hoffman Affirm. Ex. E ¶ 46.) The earliest Dadras and Shaftel could have entered into an agreement was in or about March 1978 when Dadras first met with TRC. (Hoffman Affirm. Ex. E ¶ 7.) A reasonable reading may support the conclusion that Dadras expected payment for the services in connection with construction drawings and calculations performed

by Dadras International by the end of 1978. (Hoffman Affirm. Ex. E ¶¶ 35–46.) Under these circumstance, performance by both parties was possible within one year, notwithstanding TRC's failure to remit payment to Dadras due to the Iranian Revolution. In fact, the Tribunal award calculated interest from September 1978 for services performed by Dadras International, the very services for which Shaftel claims he was involved. As well, whether the TRC contract was severable into two separate components raises additional factual questions. Numerous triable issues of material fact therefore exist sufficient to deny Defendant's motion for summary judgment based on the Statute of Frauds issue respecting the Shayhad project.

■■■■ Dadras also asserts a Statute of Frauds defense as it pertains to the alleged modification of the Agreement whereby Shaftel agreed to allow Dadras to pursue the litigation against the government of Iran and accept ten percent of the resulting award, if any. Because Shaftel was aware that the litigation could take up to "10 years" and was likely to be a long process, Dadras maintains that it was impossible to perform within one year. The Statute of Frauds does require complete "performance of the contract and not just of one party thereto," *Cron*, 91 N.Y.2d at 368, 670 N.Y.S.2d at 976, 694 N.E.2d 56, however, performance pertaining to the calculation and payment of compensation is not readily subject to such decisive analysis. In fact, the court in *Cron* examined a similar circumstance of an at-will oral employment contract requiring the calculation of bonuses necessarily occurring after the passage of one year. After considering the divergent precedents in the appellate departments, the court adopted the reasoning that "future satisfaction of a pre-existing liability involves the matter of computation only and is merely mechanical in its application," *id.* at 369, 670 N.Y.S.2d at 977, 694 N.E.2d 56, and consequently held that "when the employment relationship is terminable within a year and the

measure of compensation has become fixed and earned during the same period, the sole obligation to calculate such compensation will not bring the contract within the one-year proscription of the Statute of Frauds." *Id.* at 370, 670 N.Y.S.2d at 977, 694 N.E.2d 56. Although *Cron* can be readily distinguished from the case at bar, the reasoning counsels a similar conclusion herein.

■■■■ Defendant also suggests that the modified agreement is an oral modification, which absent new consideration, is unenforceable absent a writing. Whether Shaftel provided new consideration in the form of financial litigation support or available testimonial support is a factual inquiry unsuited for determination as a matter of law.

■■■■ In response, Plaintiff raise his full or partial performance as an exception to the applicability of the Statute of Frauds. For partial performance to overcome the Statute of Frauds it must be "unequivocally referable" to the new contract or oral modification. *See Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (1977); *see also Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 450 N.E.2d 215 (1983); *Adelman v. Rackis*, 212 A.D.2d 559, 622 N.Y.S.2d 564 (2d Dep't 1995); *Pomeranz v. Blodnick*, 162 A.D.2d 323, 325, 556 N.Y.S.2d 902 (1st Dep't 1990). As interpreted by the New York Court of Appeals, this standard means that the action taken must be "unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Anostario*, 59 N.Y.2d at 664, 463 N.Y.S.2d at 410, 450 N.E.2d 215 (citation and internal quotation omitted). This is a stringent standard because if the performance is "reasonably explained" by the possibility of other reasons for the conduct, the performance is equivocal. *Id.* Further, if the action confers no benefit on the party against whom enforcement is sought, it does not amount to partial performance sufficient to overcome the statute. *See*

*Philips Credit Corp. v. Regent Health Group, Inc.,* 953 F.Supp. 482, 515 (S.D.N.Y.1997).

This exception contemplates the actions of both parties and "the defendant's conduct, taken together with the plaintiff's, can be deemed probative of whether an oral agreement in fact existed." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group Plc,* 150 F.3d 194, 200 (2d Cir.1998) (certifying questions to New York State Court of Appeals as to whether inaction can be unequivocally referable to oral agreement and whether defendant's conduct alone is enough to satisfy the part performance exception to the Statute of Frauds).

 Plaintiff avers that Dadras' acknowledgment of the debt, as attested to by numerous witnesses, and his subsequent partial payment thereof, constitutes partial performance unequivocally referable to the oral modification. Although subject to varied interpretation, a reasonable juror could conclude that Dadras' proffer of two checks totaling $35,000.00 after allegedly telling Shaftel that he was awarded $350,000.00 by the Hague Tribunal represented partial performance unequivocally referable to their agreement that Shaftel would receive ten percent of the award. Plaintiff's performance under the Agreement cannot be denied, in fact, Defendant included in interrogatories pertaining to the bankruptcy of Resorts International claims for work performed by Shaftel. (Hoffman Affirm. Ex. B.) Thus, although this exception is exacting, and courts often interpret the payment of money as not sufficiently referable to the oral modification, *see Amresco Fin. I, L.P. v. Stone–Tec, Inc.,* No. 98 Civ. 2872, 1998 WL 888987, at *3 (S.D.N.Y. Dec.21, 1998), Dadras' purported statement tying the payment to the Tribunal award, among other actions, establishes a genuine issue of material fact as to whether the performance by the parties pursuant to the Agreement and the alleged oral modification takes it outside the purview of the Statute of Frauds. *Cf. Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir.1990) ("If the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced.").

Accordingly, genuine issues of material fact preclude summary adjudication of Dadras' Statute of Frauds defense.

Finally, all other claims and assertions raised by the parties are not integral to the determination of the instant summary judgment motion and will not be addressed herein.

## CONCLUSION

For all the aforementioned reasons and in accordance with this Memorandum and Order, Defendant's motion for summary judgment is denied in its entirety.

SO ORDERED.